### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, :<br><br>Plaintiff, :<br><br>v. :<br><br>STEVEN R. GARFINKEL AND MICHAEL O'HANLON, :<br><br>Defendants. : | Civil Action No. |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges the following against defendants Steven R. Garfinkel ("Garfinkel") and Michael O'Hanlon ("O'Hanlon") (collectively "Defendants"):

## SUMMARY

1.       This case involves a financial fraud, which caused the collapse of DVI, Inc. ("DVI"), a specialty finance company that loaned money to small healthcare service providers for the purchase of high-end medical equipment. Between approximately August 1999 and August 2003 ("the relevant time period"), DVI's Chief Executive Officer and President, Michael O'Hanlon, and its Chief Financial Officer, Steven R Garfinkel, used fraudulent means to conceal the company's liquidity crisis from investors and to fraudulently obtain additional funding from its commercial lenders.

1

2.        Beginning in 1999, to conceal a growing cash crisis at DVI, O'Hanlon and Garfinkel engaged in a fraudulent scheme to obtain additional funding from its lines-of-credit by pledging collateral that did not meet the quality-related criteria specified in the loan covenants.  In addition, O'Hanlon and Garfinkel sent DVI's commercial lenders false monthly reports to make it appear that there was adequate and appropriate collateral securing the lines-of-credit.  As DVI's financial crisis worsened, O'Hanlon and Garfinkel, who were responsible for reporting on collateral compliance to the company's lenders, manipulated paperwork to enable DVI to double pledge collateral and falsify reports to its lenders.

3.        O'Hanlon and Garfinkel concealed the cash crisis and fraudulent scheme from investors by knowingly filing false and materially misleading Commission reports and issuing false and materially misleading press releases.  In furtherance of their scheme, O'Hanlon and Garfinkel also aided and abetted DVI's filing violations by knowingly falsifying or causing others to falsify certain books and records, circumventing internal controls and misleading DVI's auditors.

4.        In July 2003, during a compliance audit, one of DVI's lenders discovered the fraudulent scheme.  Once the rest of DVI's lenders learned of the fraud, they promptly terminated their lines-of credit to DVI, eliminating the company's ability to borrow money.  Without cash to meet its financial commitments, DVI filed for bankruptcy in August 2003.

5.        By engaging in the conduct described in this Complaint, Defendants violated Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1, 13b2-2 and 13a-14

thereunder [17 C.F.R. § 240.10b-5, 240.13b2-1, 240.13b2-2 and 240.13a-14], and aided and abetted DVI's violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. § 240.12b-20, 240.13a-1 and 240.13a-13].

6.      Accordingly, the Commission seeks:  (a) entry of a permanent injunction prohibiting Defendants from further violations of the relevant provisions of the Exchange Act; (b) seeks civil penalties from O'Hanlon; and (c) and order permanently prohibiting Defendants from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act; and (d) any other relief this Court deems is necessary and appropriate under the circumstances.

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§78u(d) and 78u(e)], to enjoin such acts practices, and courses of business, and to obtain civil money penalties and such other and further relief as the Court may deem just and appropriate.

8.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

9.      Venue is appropriate in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, and courses of business constituting the violations alleged herein occurred within the Eastern District of Pennsylvania because DVI had its headquarters in, and conducted business in, the Eastern District of Pennsylvania.

## DEFENDANTS

10.        Steven R. Garfinkel, age 65, is currently incarcerated in Fort Dix, New Jersey, and is a former resident of Philadelphia, Pennsylvania.  Garfinkel joined DVI in 1995 and is its former Executive Vice President and Chief Financial Officer.  He was placed on administrative leave on August 13, 2003, after his involvement in the double-pledging of collateral was discovered and his employment was formally terminated on April 14, 2004.

11.        Michael O'Hanlon, age 62, a resident of West Palm Beach, Florida, is the former President and Chief Executive Officer of DVI.  O'Hanlon joined DVI in March 1993 and served as an Executive Vice-President until November 1995 when he became CEO and President.  O'Hanlon officially resigned from DVI on August 11, 2003, but continued as a consultant to DVI until September 2, 2003.  Since leaving DVI, O'Hanlon established, and has been employed as a consultant by, Cypress, Inc., a company that provides consulting to health care companies.

## RELEVANT ENTITIES

12.        DVI, Inc. was a Delaware corporation headquartered in Jamison, Pennsylvania, and the parent holding company for DVI Financial Services, Inc., DVI Business Credit, Inc., and other related DVI subsidiaries.  Between 1994, the year before O'Hanlon became CEO, and 2002, DVI's net financed assets grew from $232 million to $1.4 billion.  For its fiscal year-end June 30, 2002, DVI had total revenues of approximately $139 million, over $1.7 billion in reported assets, $229 million in shareholder equity and 506 full-time employees.  DVI's common stock was registered

with the Commission pursuant to Section 12(g) of the Exchange Act and was traded on

the NYSE during the relevant period.  The NYSE suspended trading in DVI's stock on

August 14, 2003 and DVI filed for bankruptcy protection on August 25, 2003.  The DVI

Liquidating Trust terminated the registration for DVI's common stock on August 16,

2005.

13.    DVI Financial, Inc. ("DVI Financial") was a Delaware corporation

headquartered in Jamison, Pennsylvania, and was DVI's flagship subsidiary, which

provided financing for the purchase of high-end medical equipment.  This entity is now

defunct.

14.    DVI Business Credit Corp. ("DVI Business Credit") was a Delaware

corporation headquartered in Jamison, Pennsylvania, that provided additional financing

to DVI's customers based on medical accounts receivable.  This entity is now defunct.

## FACTS

### A.    DVI's Business and Financing Strategies

15.    DVI was a specialty finance company, which provided loans and lease

financing to healthcare service providers, principally through its flagship subsidiary --

DVI Financial.  DVI marketed itself as a specialty lender designed to help entrepreneurs

acquire expensive medical equipment for the growing out-patient medical center market.

DVI aggressively sought new customers and new markets for its loan business.

16.    DVI financed its operations through two sources of funding.  First, to fund

the initial loans to its customers on a short-term basis, DVI relied primarily upon various

commercial lenders to provide financing via lines-of-credit, known as warehouse lines-

of-credit.  For example, early in the relevant time period, Lender A provided DVI with a

$100 million line-of-credit and throughout the relevant time period, a group of lenders (collectively referred to as the "B Lenders") provided DVI with a combined $150 million senior secured line-of-credit ("B Lenders line-of-credit"). Lender C also provided DVI with two lines-of credit totaling $405 million during the relevant time period: (1) a secured on-balance sheet warehouse loan of $150 million; and (2) a secured off-balance sheet warehouse loan of $255 million. For ease of reference, Lender C and the B Lenders will be collectively referred to as the "warehouse lenders."

17.     These warehouse lines-of-credit were DVI's lifeline. The company used the cash from those credit lines to fund the loans which it, in turn, made to its customers while DVI obtained other long-term financing for its loans. As a prerequisite to loaning DVI money on these lines-of-credit, the warehouse lenders required that DVI secure its lines-of-credit with high quality collateral, namely other customer loans which met strict quality-related criteria.

18.     Under the terms of the loans, to protect the warehouse lenders' exposure, DVI could not pledge delinquent or otherwise distressed loans and the pledged loans had to be spread among a diverse group of obligors. To ensure that DVI did not borrow more money than it had adequate collateral to support, the warehouse lenders required that DVI send them monthly reports, called "borrowing base reports" and "servicing reports." These reports contained a list of the specific loans DVI used as collateral to secure the funds it had borrowed. Further, a senior DVI official, usually Garfinkel, had to sign the reports and certify that the collateral met the quality criteria required by the loan covenants.

19.　　　　Second, to raise capital and support its long-term financing, DVI periodically bundled certain customer loans for securitization and sold bundles of its loans to one or more special purpose entities ("SPEs"), subsidiaries of DVI Financial Services, on a quarterly basis.  These loans would then be securitized by the SPEs on a semi-annual basis and DVI would sell these securitization packages on the open market, typically to institutional investors.  DVI used the proceeds from these sales to pay down the lines-of-credit, thus freeing up more money to fund new loans to its customers. During the relevant time period, Lender C was the primary underwriter for DVI's securitization packages.  Similar to the warehouse lines of credit, under the terms of its securitization agreements, the loans included in these packages had to meet strict quality-related criteria similar to those discussed above and DVI had to submit monthly "servicing reports" that verified that the individual loans within the securitization packages continued to meet the required quality-related criteria.

**B.**　　**DVI's Executive Management Structure Was Insular**

20.　　　　During the relevant time period, O'Hanlon controlled DVI and its subsidiaries.  O'Hanlon established a management structure whereby he and Garfinkel controlled all financial matters related to DVI's domestic operations, including all financial matters for its subsidiaries, DVI Financial and DVI Business Credit.  Garfinkel was primarily responsible for all financial matters within DVI, including its reports to lenders.  Further, O'Hanlon and Garfinkel were ultimately responsible for all financial reports to, and filings with, the Commission, the financial information in press releases to investors and signing DVI's Forms 10-Q and 10-K.  This insulated management structure

7

permitted O'Hanlon and Garfinkel to devise, run and conceal the fraudulent scheme from the lenders, DVI's Board of Directors, other managers within DVI and its auditor.

**C.   DVI's Liquidity Problems Gave Rise to the Fraudulent Scheme**

21.     DVI was highly leveraged to fund its growth and relied on the securitization of long-term, interest-bearing instruments (its loans) to repay its short-term debts (lines-of-credit).  As a result, its business was very sensitive to interest rate changes.  DVI's growth also was dependent on its ability to obtain ever increasing amounts of short-term financing from commercial lenders.  Any unfavorable changes in market conditions affecting its customers (in addition to interest rate changes) or DVI's financial condition could make such financing difficult to obtain or prohibitively expensive.  For example, a loss of any short-term financing could leave DVI unable to fund the loans it had made to its customers.  Likewise, unfavorable market conditions could affect DVI's ability to securitize its customer loans and, in turn, its ability to repay its lenders.

22.     Between 1999 and 2003, several factors converged and caused DVI to face an increasing cash shortage.  First, O'Hanlon decided to expand DVI's business into foreign markets, which increased DVI's operating costs and its exposure to volatile markets in Latin America, Europe and the Far East.  As a result, DVI's credit exposure in its foreign operations for the years ending 2000, 2001 and 2002 exceeded $286, $315 and $350 million, respectively.  Second, DVI experienced a significant increase in non-performing customer loans, which, in turn, reduced its legitimate access to its lines-of credit.  Specifically, in mid-1999, $25 million worth of customer loans in one of DVI's securitization packages were not performing and were in danger of becoming delinquent

8

due to late payments.  Under the terms of the securitization agreements, DVI had several options with regard to the non-performing loans.  It could:  (i) allow the distressed loans to default; (ii) replace the distressed loans with new, performing loans; or (iii) buy back the distressed loans.

23.      O'Hanlon and Garfinkel were aware that DVI could not afford any of these options.  First, any default would trigger expensive acceleration clauses and significantly reduce DVI's credit ratings.  This would reduce the value of any future securitization packages, which DVI tried to sell in the marketplace and directly impacted DVI's ability to raise capital.  Second, DVI did not have sufficient loans in good standing available to replace the non-performing loans in the securitization packages.  The combination of the first and second factors, plus the fact that one lender had concurrently withdrawn its $100 million line-of-credit, caused DVI to be $15 million short of the funds needed to repurchase the non-performing loans.

24.      Rather than attempt to work out DVI's obligations with its lenders, Garfinkel and O'Hanlon embarked upon a fraudulent scheme to conceal the company's liquidity crisis and withdrew the needed money from its line-of-credit from the B Lenders, falsely representing that DVI had eligible collateral to support those loans. O'Hanlon and Garfinkel knew that because of their actions, the B Lenders could have immediately terminated DVI's line-of-credit because DVI was "out-of-compliance" with its loan covenants.  They further were aware that if the company's out-of-compliance status was disclosed, other lenders might lose confidence in DVI's financial condition and terminate their lines-of-credit, potentially resulting in the subsequent financial collapse of DVI.

25.      O'Hanlon and Garfinkel therefore concealed the company's cash problems from the B Lenders to keep their access to financing open.  On August 18, 1999, Garfinkel sent O'Hanlon a memo in which he described the severity of DVI's cash position, urged O'Hanlon to raise additional capital from a wealthy family that was one of DVI's major shareholders ("Major Shareholders") and discussed the fraudulent plan to pledge ineligible collateral to access cash from the warehouse lenders in the event they could not raise it from the Major Shareholders.

26.      To ensure that DVI's August 1999 borrowing base report, which was due to the B Lenders in October, did not reflect that DVI lacked sufficient eligible collateral to support the amount it had drawn from the line-of-credit, Garfinkel approached an employee in DVI's Treasury Department who was responsible for creating the monthly borrowing base reports, and asked her to falsify this report.  Although this employee reported directly to Garfinkel, she refused to alter the report unless she received a direct order from O'Hanlon.  Subsequently, O'Hanlon told her specifically to "fix the [August 1999 borrowing base] report" to give the appearance that DVI had been in compliance during that time period.

27.      This employee subsequently modified the report and changed the parameters of distressed loans to make them appear eligible to be used as collateral.  She also made the alterations to the borrowing base report itself as well as to an attached Excel spreadsheet detailing the loans pledged.  Although this employee normally certified the accuracy of these reports on behalf of DVI, she refused to certify this report, which was now false.  As a result, Garfinkel certified the report on October 15, 1999, and ensured that it was sent to the B Lenders.

28.     Although the borrowing base report was falsified, no one modified the information in DVI's InfoLease system ("InfoLease"), the computer program the company used to track its loans. DVI used InfoLease to keep up-to-date records on its customers' loan values, payment terms, schedules and payments made, and used this information to prepare reports for its lenders. Because no one manipulated the data contained on InfoLease, the internal records continued to reflect that DVI lacked the requisite eligible collateral to support its line of credit.

### D.     DVI's Fraudulent Conduct Escalated due to Increasing Liquidity Problems

29.     O'Hanlon and Garfinkel had hoped that these deliberate efforts to conceal the company's cash problems from the B Lenders would be a stop-gap measure while O'Hanlon pursued other avenues to alleviate DVI's cash-flow crisis. DVI's liquidity problems, however, continued to escalate. Through the spring of 2000, DVI continued to submit reports to the B Lenders concealing the fact that it was out-of-compliance with its lines-of-credit. In addition, DVI began using the same scheme to obtain cash from its lines-of-credit with Lender C, again using false reports to make it appear that it was in compliance with its loan covenants.

30.     At the same time, Garfinkel urged O'Hanlon to get DVI out of the international market in order to free up capital. O'Hanlon made no significant moves to exit the international arena and, instead, attempted to mollify Garfinkel by stating he would find the needed cash to solve the compliance problem. He failed to do so, and by January 2001, DVI's liquidity crisis had reached such an extreme level that DVI did not even have sufficient eligible collateral to pledge against its lines-of-credit.

31.     At that point, Garfinkel had DVI simultaneously pledge the same collateral to both the B Lenders' and Lender C's lines-of-credit by listing the same loans in the borrowing base reports to both entities and manipulating the Excel spread sheets, which accompanied the reports.  Once again, however, Garfinkel declined to manipulate the data within the InfoLease system, which continued to reflect insufficient collateral.

32.     Following Garfinkel's actions, in February or March 2001, the employee in DVI's Treasury Department spoke with DVI's in-house counsel ("In-House Counsel") about her ethical concerns with the continuing falsification of the borrowing-base reports. In-House Counsel voiced similar concerns concerning DVI's aggressive loan workout strategy.  Soon after their discussions, both the Treasury Department employee and In-House Counsel resigned in March 2001.  In her March 13, 2001 letter of resignation to Garfinkel, the Treasury Department employee wrote:

> I can no longer withstand the ethical dilemmas that DVI keeps
> placing on me.  These include funding transactions without enough
> collateral to justify the borrowing of the cash and the double
> pledging of assets in the [B Lenders] borrowing base.  These
> actions were known and directed by the executive management of
> DVI.  I repeatedly expressed my concerns to you and to Mike
> [O'Hanlon] but there was no change in the behavior of company
> management to address these issues.

33.     A DVI Board member, ("Board Member"), learned of this Treasury Department employee's resignation and spoke with Garfinkel.  Garfinkel told the Board Member that this employee resigned because DVI could not remain in compliance with the B Lenders' loan covenants.  Surprised and concerned, the Board Member confronted O'Hanlon directly about the compliance issue.  O'Hanlon falsely represented that any non-compliance with the loan covenants was minor, likening the non-compliance to a

checking account being overdrawn, and that DVI always quickly returned to full compliance.

34.       The Board Member told O'Hanlon that he did not believe that any non-compliance was minor and emphasized to O'Hanlon that it was imperative that DVI remain fully compliant with the lenders' covenants. The Board Member added that he intended to follow-up with O'Hanlon on a monthly basis to ensure that DVI was in full compliance. After this discussion, the Board Member checked in periodically with O'Hanlon who repeatedly assured him that DVI was in compliance with its loan covenants.

35.       During this same time period, O'Hanlon and Garfinkel also falsely assured other members of the Board of Directors, at meetings and in personal conversations, that DVI was in compliance with the loan covenants. They repeatedly misled the Board that DVI was in good overall financial condition and that it had the cash necessary to execute its plans. As a result, the Board was unaware of the full extent of the loan compliance and cash liquidity problems and by September 2002, DVI's non-compliance with its lines-of-credit had increased to over $44 million.

36.       In October 2002, DVI received an $11 million cash call from one of its lenders, which required DVI to repurchase a substantial group of defaulting loans from its securitization pools. At the same time, DVI needed to fund a $14 million payment to the bondholders of one of its bankrupt borrowers before it would be able to refinance the defaulted loans. Since DVI had no cash, Garfinkel appealed to O'Hanlon to attempt to find additional sources of capital.

37.        In November 2002, Garfinkel requested that O'Hanlon solve the liquidity
and compliance problems "once and for all" and sent O'Hanlon a memo, stating:

> We have been dealing with out-of-compliance borrowing
> bases for over two years and somehow managed to survive.
> We have been close to the limit before but always saw
> positive cash flow ahead of us.  There are now new events
> that have drastically changed the dynamics of what we are
> dealing with – mainly delinquency triggers in the
> securitizations.  These have come about because of large
> (and inappropriate) obligor concentrations.  An overall
> increase in the delinquencies of other loans in the pools is
> what has pushed the large concentration accounts over the
> limit.

O'Hanlon dismissed Garfinkel's concerns and assured him that he could obtain financing
from other lenders in the near future and that the company, by increasing its sales, could
grow itself out of its liquidity crisis.

38.        Despite these problems, in connection with its 2002 audit, DVI's
Management Representation Letter to its auditor, dated October 11, 2002, falsely stated,
among other things:  (i) "there has been no fraud or possible irregularities involving
management;" (ii) "the [c]ompany has complied with all aspects of contractual
agreements that would have an effect on the financial statements in the event of
noncompliance;" (iii) all transactions have been properly recorded in the company's
accounting records; and (iv) "[a]rrangements with financial institutions . . . involving
restrictions on cash balances and lines-of-credit" have been properly recorded and
disclosed.

39.        By early 2003, Garfinkel's compliance report showed that for February
2003, DVI was out-of-compliance on the loan covenants with its lenders by over $120
million.  Garfinkel also predicted that, by March 2003, DVI would be out-of-compliance

by over $145 million.  In a handwritten note to O'Hanlon on the report, Garfinkel stated: "Michael -- This is getting to extremely serious levels …."  In an undated memo from this period written to O'Hanlon, Garfinkel discussed his own frustration at participating in decisions made or approved by the Board about "raising capital or selling business assets that I know would have a different answer with fuller disclosure of the company's liquidity situation."  Garfinkel again requested that O'Hanlon help in locating legitimate sources of cash.  In this memo, Garfinkel outlined DVI's "history of non-compliance" and implicated himself and O'Hanlon as responsible for DVI's current "untenable position," adding that "[d]esperate people do desperate things when their backs are to the wall … .  We have moved close to both cash and moral bankruptcy."

40.     O'Hanlon responded in a handwritten memo to Garfinkel that enough cash would appear shortly to solve the immediate crisis and stated:  "The following is a list of cash deals that either have occurred or will over the next 30 days.  Hopefully, this will give you [Garfinkel] some comfort."  Despite O'Hanlon's assurances to Garfinkel that DVI would find outside funding, none ever actually materialized.

> **E.     Lender C Hired an Auditing Firm to Review the Loans and Collateral and Discovered Irregularities in the Reporting**

41.     During approximately March 2001, a Senior Vice President of the Treasury Department at DVI Financial ("DVI Financial VP") became concerned that DVI was out-of-compliance with its Lender C line-of-credit.  The DVI Financial VP expressed his concerns repeatedly to Garfinkel and O'Hanlon, who collectively told him that the business was fine and that these issues were not part of his job responsibilities. In March 2003, the DVI Financial VP became so concerned that he independently contacted the lender and suggested that it conduct a compliance audit.

42.         In response, Lender C hired an auditing firm to perform a review of DVI's financial practices and procedures.  As part of that review, the firm reviewed a random sample of loans that DVI had pledged as collateral.  During its audit, the firm called a meeting with O'Hanlon, the President of DVI Financial who was also the Executive Vice-President of DVI ("President of DVI Financial"), Garfinkel, the DVI Financial VP and members of DVI's credit department.  At this meeting, the firm advised those present that DVI had pledged loans which were not in compliance with the loan covenants and that DVI had to resolve these problems because "[Lender C would] not let this go on like that."  The DVI Financial VP grew increasingly concerned during the audit and resigned on April 2, 2003.

43.         On May 7, 2003, the audit firm reported to Lender C that DVI had pledged ineligible collateral, but significantly, it did not attempt to quantify the degree to which DVI was of out-of-compliance because it had not been retained to conduct a full audit of DVI's borrowing base.  The audit firm, therefore, did not detect the double-pledging of collateral, which would have provided a significant red flag that DVI was in dire financial condition.

44.         In response to the audit firm's findings, Lender C imposed more stringent procedures on DVI for obtaining funding under its lines-of-credit.  It now required, in addition to Garfinkel's certification of the borrowing base reports, that O'Hanlon or the President of DVI Financial sign a certification stating that the assets pledged were eligible and did not violate any covenants under the loan agreements.  Going forward, however, only Garfinkel and O'Hanlon signed the certifications.

16

### F.    <u>The Scheme Collapsed</u>

45.      Simultaneously, DVI's auditor was becoming suspicious about a number of DVI loans and was pressing the company for additional information.  DVI's auditor was concerned that DVI could not justify the value of its purported $2.6 million interest in a failing medical center located in Corpus Christi, Texas, and was concerned that DVI's "work-out" program was not being managed effectively and simply might be masking "bad" loans.  In May 2003, DVI's auditor refused to sign off on DVI's third-quarter 2003 Form 10-Q and resigned on June 4, 2003, after it could not reach agreement with DVI regarding the loan and related financing transactions for the Corpus Christi medical center.

46.      When it learned of the resignation of DVI's auditor, the B Lenders hired an outside consulting firm to perform a compliance audit at DVI.  The audit included a review of the borrowing base reports that applied to all lines-of-credit used by DVI as of May 31, 2003.  The consulting firm also requested that DVI create a Contract Balance Remaining Roll Forward Report ("CBR Report") for the period they were auditing.  This report, which would be created from the data in DVI's internal InfoLease system, would show all of the loans which DVI had pledged to the B Lenders.  According to the B Lenders' expectations, the amount of the loans pledged as collateral should support the amount of funds DVI had drawn from its line-of-credit with the B Lenders.

47.      This was the first time any of the lenders or their auditors had requested that DVI prepare this report.  Garfinkel was aware that the CBR Report would clearly reveal that DVI did not have enough collateral to support the amount it borrowed from the B Lenders because when DVI had fraudulently pledged ineligible assets or double-

pledged assets to its lenders, it had only falsified the Excel spreadsheets submitted to the lenders with the borrowing base reports. No one had ever manipulated the data in DVI's internal InfoLease system, which was not shared with the lenders and, therefore, reflected the true status of all of DVI's loans with its customers. Garfinkel knew that there were not enough loans in the InfoLease system assigned to the B Lenders to justify the amount DVI had borrowed and, therefore, the CBR Report would expose the entire scheme.

48.      As a result, late in the evening on July 3, 2003, Garfinkel, for the first time, ordered changes in the InfoLease system to conceal the imbalance before the consulting firm began its audit. Specifically, Garfinkel directed DVI's Cash Manager, a low-level employee in the Treasury Department -- to enter enough loans into the InfoLease system to reconcile the B Lenders' accounts. This employee, at Garfinkel's direction, "fixed" the imbalance by adding loans to the B Lenders' account which previously had been pledged to Lender C's account. This manipulation would be ultimately easily detectible, however, because anyone who manually compared the borrowing base reports could readily determine that the same collateral was now simultaneously pledged to both the B Lenders and Lender C.

49.      The consulting firm arrived at DVI on July 7, 2003, and eventually performed such a manual comparison. It learned that forty contracts, totaling over $58 million, were currently pledged to both the Lender C's and the B Lenders' lines-of-credit. The consulting firm demanded an immediate explanation.

50.      An employee in DVI's Operations Department investigated the B Lenders' complaints and concluded that "DVI ... intentionally double-pledged a significant amount of collateral." The employee discovered that "on at least three dates

in July 2003, [Operations] received Contract Readjustment Request Documents (CARDS) from [an individual] in Treasury requesting InfoLease changes to the closed May 2003 month-end database …[which] resulted in DVI pledging collateral to [the B Lenders'] lines of credit which had already been pledged to [Lender C]." This employee then telephoned and wrote a letter to her supervisor, the Chief Accounting Officer of DVI Financial, informing him of her discovery. The Chief Accounting Officer then passed on this letter to the DVI Board Member, who had confronted O'Hanlon before. This was the first time that the Board Member became fully aware of the severity of the situation and DVI's massive financial crisis.

51.      Once the lenders and DVI's Board learned of the double-pledging of collateral, Garfinkel and O'Hanlon could no longer conceal their fraudulent scheme. On August 13, 2003, DVI issued a press release and filed a Form 8-K disclosing the existence of the fraud and indicating that the company was still investigating the matter. DVI's Board placed Garfinkel on administrative leave on August 13, 2003, and removed O'Hanlon as CEO on August 11, 2003. DVI formally terminated Garfinkel's employment on April 14, 2004. The Board terminated O'Hanlon's relationship with DVI on September 2, 2003, after his involvement in the scheme became known.

52.      On August 14, 2003, the day following the public announcement of the fraud, DVI's stock price fell almost 70 percent, from 80 cents per share to 25 cents per share. The lenders demanded repayment of all loans and DVI lost all of its outside funding sources, which left it unable to continue its operations. On August 25, 2003, DVI filed for bankruptcy.

### G.   O'Hanlon and Garfinkel made Public Misrepresentations and Misstatements

53.      As DVI's CEO and CFO, O'Hanlon and Garfinkel were ultimately responsible for the preparation and accuracy of the company's filings with the Commission and its public press releases.  From the outset of the fraud through DVI's declaration of bankruptcy, a four-year span from August 1999 through August 2003, O'Hanlon and Garfinkel caused DVI to file a total of twelve Forms 10-Q (plus two amendments) and four Forms 10-K that they knew were false and misleading and, themselves, directly issued numerous press releases, which they knew contained materially false and misleading information and omissions.

54.      On August 10, 1999, the date that Garfinkel and O'Hanlon first pledged ineligible loans to fraudulently secure additional funding from the B Lenders' line-of-credit, O'Hanlon issued a press release regarding DVI's fiscal year performance which stated, "DVI delivered another strong financial performance in fiscal 1999, extending its string of increases in net income and earnings per share . . . .  During this fiscal year, the Company widened further its financial margins, maintained its credit quality, expanded its available funding capacity and added important new institutional relationships."  O'Hanlon did not disclose DVI's current struggles with funding, the deteriorating quality of the loans securing the company's lines-of-credit or its burgeoning liquidity crisis.

55.      On October 28, 1999, less than two weeks after Garfinkel signed the first falsified borrowing base report, DVI issued a press release announcing the completion of two asset-backed securitizations.  In this release, Garfinkel commented:

> DVI continues to use the asset-backed securitization market as part of a balanced approach to serve the Company's capital needs.  We are pleased with the execution of both of these transactions and the continued strong reception of our notes in this market.  While the

> spreads in the market vary over time, the asset-backed
> securitization market remains a very viable source of capital to the
> Company. Increasingly, we see DVI transactions becoming a
> 'benchmark' for equipment-backed placements.

Garfinkel failed to disclose that DVI was financially unbalanced, struggling with a growing liquidity crisis and had resorted to pledging ineligible collateral to secure funding to keep its business afloat until the securitizations were completed.

56.     On November 8, 1999, DVI announced its first quarter results with the following statement from O'Hanlon: "DVI is off to a great start toward its fiscal year 2000 new business and earnings targets." DVI's Form 10-Q, filed three days later, contained the following misleading language in the Management's Discussion and Analysis ("MD & A") section: "We believe that our present warehouse and permanent funding sources are adequate to fund our current needs for our equipment and medical receivables financing." Significantly, the Form 10-Q contained no disclosure that DVI risked losing both its short and long-term funding if its portfolio of loans did not contain sufficient eligible collateral. Without this risk disclosure and the factual disclosure that DVI did not actually have sufficient eligible collateral to legitimately access those funding sources, the Form 10-Q contained affirmative misstatements about a critical aspect of DVI's business – its legitimate ability to access funding sources. O'Hanlon and Garfinkel, as CEO and CFO of DVI respectively, signed this Form 10-Q on November 15, 1999. As the architects of the fraudulent scheme, they knew that by signing the Form 10-Q they were causing DVI to make false public statements and misrepresentations.

57.     Garfinkel and O'Hanlon knowingly continued to issue public statements which falsely painted a positive picture of DVI's financial condition and neglected any mention of the company's non-compliance and liquidity problems. For example, each of

the Forms 10-Q for fiscal year 2000, filed in 2000 and signed by O'Hanlon and

Garfinkel, contained the identical misleading language in the MD & A section as the

1999 Forms 10-Q.  In the Form 10-K, signed by Garfinkel and O'Hanlon on September

25, 2000, DVI disclosed that its need for warehouse and permanent funding had

significantly increased, but still did not disclose that it was defrauding its lenders to

obtain access to funds needed to run its business or that it was using ineligible collateral

to access its warehouse funding.

58.      In a January 16, 2001 press release, O'Hanlon commented, "The rapid

growth in DVI's managed net financed assets, earnings per share and new loan

originations and commitments demonstrates the success of DVI's strategy to be a global

leader in healthcare equipment finance."  In the Commission filings for the fiscal year

2001, signed and certified by O'Hanlon and Garfinkel, DVI falsely represented that it had

sufficient funding to execute its growth strategies and that the company was in

compliance with the loan covenants with its commercial lenders.  DVI's Form 10-K for

2001 affirmatively stated that, "as of June 30, 2001, management believes that the

Company was in compliance with the financial covenants of these agreements."

59.      On May 14, 2002, while DVI's out-of-compliance position was climbing

to record highs, Garfinkel and O'Hanlon participated in a third quarter earnings call for

DVI's investors.  During this call, Garfinkel and O'Hanlon highlighted the strength of

DVI's earnings and avoided any comment regarding liquidity and funding problems.

Garfinkel stated:  "I'd like to focus on the strong earnings, excluding the charges that

were well over last year, [that] represent the core strength of the company."  O'Hanlon

emphasized, "the business of the company has never been better."  In response to a

question posed, Garfinkel admitted that "this is a year of raising capital for the company." Neither O'Hanlon, nor Garfinkel disclosed that DVI was facing a dire liquidity crisis or funding problems; instead, they continued to purposely misrepresent the health of DVI. In October 2002, Garfinkel and O'Hanlon signed and certified DVI's Form 10-K for fiscal year 2001, which continued to make false representations regarding its compliance with lending covenants.

60.     Although the auditing firm hired by Lender C informed Garfinkel and O'Hanlon in the late March/early April 2003 meeting that DVI was out of compliance with its loan covenants with Lender C, Garfinkel and O'Hanlon signed and certified a Form 10-Q filed on May 20, 2003 (for the quarter ended March 31, 2003), in which they made the same intentional misrepresentations concerning DVI's liquidity and compliance as they had in previous years.  During the time period covered by this filing, DVI's out-of-compliance position had risen to over $120 million as a result of its liquidity crisis. Three months later, on August 25, 2003, DVI filed for bankruptcy because it had lost all outside sources of funding due to the fraud it had perpetrated on its lenders.

61.     The misrepresentations in DVI's periodic reports and press releases were clearly material to investors because they were relevant to DVI's financial viability and survival.  In fact, once DVI's fraudulent scheme became public the lenders reacted by pulling funding and the market reacted with a 70% price drop.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

62.     Paragraphs 1 through 61 are realleged and incorporated by reference as if fully set forth herein.

63.     Defendants Garfinkel and O'Hanlon, directly or indirectly, singly or in concert with others, by use of the means or instrumentalities of interstate commerce, or the mails, or of the facilities of any national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly:

       i.   employed devices, schemes or artifices to defraud,

      ii.   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or

     iii.   engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

64.     By engaging in the foregoing conduct, defendants Garfinkel and O'Hanlon, directly or indirectly, violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2 thereunder

65.     Paragraphs 1 through 64 are realleged and incorporated by reference as if fully set forth herein.

66.     Defendants Garfinkel and O'Hanlon, directly or indirectly, singly or in concert with others:

       i. knowingly circumvented or failed to implement a system of internal accounting controls or knowingly falsified any book, record, or account required to be maintained by the federal securities laws;

      ii. falsified and/or caused to be falsified any book, record or account required to be maintained under the federal securities laws; and/or

     iii. made or caused to be made a materially false or misleading statement to an accountant, in connection with:

          1. any audit, review or examination of the financial statements of the issuer required to be made under the federal securities laws, or

          2. the preparation or the filing of any report or document required to be made or to be filed with the Commission.

67.      By engaging in the foregoing conduct, defendants Garfinkel and O'Hanlon, directly or indirectly, violated and, unless restrained and enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 promulgated thereunder [17 C.F.R. § 240.13b2-1 and 240.13b2-2].

## THIRD CLAIM FOR RELIEF

### Violations of Rules 13a-14 of the Exchange Act

68.     Paragraphs 1 through 67 are realleged and incorporated by reference as if fully set forth herein.

69.     Defendants Garfinkel and O'Hanlon filed certifications for DVI's required Commission filings that contained statements that did not satisfy the requirements of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] because they contained statements that they knew or were reckless in not knowing contained untrue statements of a material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the reports.

70.     By engaging in the foregoing conduct, defendants Garfinkel and O'Hanlon directly violated Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder

71.     Paragraphs 1 through 69 are realleged and incorporated by reference as if fully set forth herein.

72.     Defendants Garfinkel and O'Hanlon knowingly provided substantial assistance to DVI, which filed with the Commission, annual and quarterly reports that were materially misleading and which failed to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of the company's assets.

73.     By engaging in the foregoing conduct, defendants Garfinkel and O'Hanlon aided and abetted DVI's violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1 and 13a-13 promulgated thereunder [17 C.F.R. § 240.12b-20, 240.13a-1 and 240.13a-13].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.     Issue an order permanently enjoining defendants Garfinkel and O'Hanlon from directly or indirectly violating Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1, 13b2-2 and 13a-14 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2 and 240.13a-14];

B.     Issue an order permanently enjoining defendants Garfinkel and O'Hanlon from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A)of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. § 240.12b-20, 240.13a-1 and 240.13a-13];

C.     Issue an order requiring O'Hanlon to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

D.     Issue an order prohibiting defendants Garfinkel and O'Hanlon, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

    E.      Enter an order granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

Daniel M. Hawke
Elaine C. Greenberg, PA Bar No. 48040
Tami S. Stark
Colleen K. Lynch, PA Bar No. 82936
Lynn H. O'Connor, PA Bar No. 47940
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE
COMMISSION
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone:  (215) 597-3100
Facsimile:  (215) 597-5885
E-mail:  LynchCK@sec.gov
E-mail:  OconnorL@sec.gov
E-mail:  GreenbergE@sec.gov

Date:  June 25, 2009